IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2006 Session

## STATE OF TENNESSEE v. OCTAVIA CARTWRIGHT

**Direct Appeal from the Shelby County Criminal Court
Nos. 00-04743; 00-04744; 00-04745; 00-04746; 00-04747; 00-04748
Arthur T. Bennett, Judge**

---

**No. W2005-02316-CCA-R3-CD  - Filed January 22, 2007**

---

The Defendant, Octavia Cartwright, was convicted of evading arrest in a motor vehicle with risk of death or injury, attempted first degree murder, two counts of especially aggravated robbery, especially aggravated burglary, and four counts of especially aggravated kidnapping. The Defendant was sentenced to an effective sentence of ninety-one years in prison as a Range I offender. On appeal, the Defendant contends that: (1) there was insufficient evidence to sustain the convictions for attempted murder and especially aggravated kidnapping; (2) the trial court improperly sentenced the Defendant; (3) the trial court erred when it determined the Defendant was competent; and (4) her constitutional right to a speedy trial was violated. After throughly reviewing the record and applicable authorities, we affirm the Defendant's convictions and sentences.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Charles E. Waldman, Memphis, Tennessee, for the Appellant, Octavia Cartwright.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

#### I. Facts

This case arises from an attack on, and entry into the home of, Karen Cook Gray[1].  The record

---

[1]At the time of the attack, the victim was Karen Cook.  Subsequently, she married her then boyfriend and became Karen Gray.  We will refer to the victim as "Cook" or "the victim."

reveals the following facts:

## A. Competency Hearing

On December 17, 2004, the trial court conducted a competency hearing. At that hearing, Dr. Lucy Vinturella of the Memphis Mental Health Institute testified and opined the Defendant was competent to stand trial. Specifically, Dr. Vinturella testified that the Defendant was admitted to the Memphis Mental Health Institute for a month-long evaluation. She received records from the Defendant, the Defendant's mother, Health Quest, the juvenile court, and the Defendant's school. Additionally, records were obtained concerning the Defendant's father and brother. Dr. Vinturella also received information about the arrest and information from the jailors. Dr. Vinturella stated she spent a minimum of three hours per week actively engaged with the Defendant. She also confirmed that the Defendant had a history of treatment at Health Quest for an alleged rape, for which she received Zoloft, an anti-depressant.

While under the care of the juvenile court, the Defendant took intelligence tests that yielded a result of sixty-nine. Dr. Vinturella stated that, although the number is similar to an IQ score, it is not exactly comparable. Additionally, scores such as these are subject to be an underestimate of the actual intelligence of the test taker, especially when, as in this case, the participant does not exert ideal effort. The doctor admitted that one who is on drugs may potentially receive a lower score than one who is not. She also stated that the Defendant had obtained her GED but had a history of drug and alcohol abuse since she was approximately nine years old. By her eighteenth birthday, the Defendant was a frequent heroin user. The doctor agreed that a multitude of factors could lower one's score, including taking drugs and the stress of being raped.

As to the actual diagnosis, Dr. Vinturella stated that the Defendant was diagnosed as a malingerer who uses cannabis and cocaine. Malingering is a situation where there is a discrepancy between what are reported as symptoms and objective findings. In a test given to determine honesty, the Defendant scored very low. The Defendant's score showed she intentionally picked the wrong answers. In two different tests, the results also showed the Defendant was a malingerer. Because of this high propensity to intentionally choose the wrong answer, the doctor determined it would not be beneficial to give the Defendant an IQ test as her scores would show an underestimate of her true intelligence.

In the written report to the trial court, the doctors at the Memphis Mental Health Institute opined that the Defendant was feigning mental illness and was competent to stand trial. Additionally, the doctors formed the opinion that the Defendant could assist her attorney in the defense of the case, and that she was competent and not committable. The trial court agreed and found the Defendant competent to stand trial.

## B. Trial

At the Defendant's trial, beginning on June 6, 2005, the following evidence was presented:

Thomas Westling testified he had lived at his current residence for seventeen years. He had known Cook, the victim, for six to eight months, and she was his next-door neighbor. Westling went to bed at 9 p.m. on August 28, 1999, and he woke to a "hideous scream" at about 1 a.m. The person was screaming, "God help me! They are trying to kill me!" He ran to the front door and found a "disheveled, bloody person" grabbing his storm door.

Westling described the person as being blood soaked with a bruised, swollen face and dirt and leaves in her hair. He did not recognize the person. His wife called 9-1-1, and his neighbor from across the street, Dr. Dingeldein, came to his front door. Once they got the person to lie down in the foyer of his home, he noticed her jawbone exposed and holes in her neck. They attempted to get a pulse but could not because of the excessive swelling. At that point, the 9-1-1 operator asked for her name, and Westling asked the person in his foyer. It was not until then that he realized it was his neighbor.

In response to questions from Westling, his wife, and Dr. Dingeldein, Cook stated that she had been jumped by a "black girl" while she was getting her mail. Cook stated that the girl had a gun and beat her over the head with it. Based on his experience in Vietnam, Westling thought Cook was going into shock. Westling's wife asked if she was going to die in their house and Westling responded that it was a good possibility.

Cook continued to describe the incident to Westling and Dr. Dingeldein, stating that a white male had come up and helped the black female. She said the two took Cook into the house and retrieved scissors out of the drawer. The white male then stabbed her with the scissors. Finally, after about twenty minutes, an ambulance arrived at Westling's house. By that time, Cook had lost a lot of blood and Westling and Dr. Dingeldein had realized that Cook had also been stabbed in the hand. The stab wound went completely through the hand. The paramedics attempted to get an IV started, and Cook was eventually flown away in a helicopter.

Westling described the injuries as if someone had been torturing Cook. After the introduction of pictures of Westling's foyer, he testified that he did not see anyone leave in Cook's Jeep. Finally, Westling stated that Cook was in his home for a total of about thirty-minutes.

On cross-examination, Westling testified that he and his wife went to bed around 9 p.m., while his eleven year old daughter went to sleep slightly earlier. He originally thought it was his daughter screaming, but he quickly realized otherwise. When he got to the front porch, he saw someone staggering out of the dark towards his front door. Westling said he needed reading glasses because he is far-sighted, but he could clearly see someone coming towards him. She was wearing something white, but it was covered in red blood. At first, Westling did not know whether to let her in or not, but after he realized she was badly injured, he decided to help, and he quickly became focused on Cook's welfare. Cook never went into shock. In describing the incident, Cook told Westling that she had been stabbed by the male, not the female. She also said that she had been struck by a gun, never mentioning a rock. Westling stated that it was about fifty feet from Cook's driveway to his front door.

-3-

On re-direct, Westling stated that he had not heard any screams thirty minutes before Cook staggered to his door. Additionally, he called Cook's boyfriend and parents to let them know what happened after Cook provided him the numbers.

Dr. Patricia Dingeldein testified that she was a licensed dentist and lived across the street from Westling. On the morning of October 29, 1999, Dr. Dingeldein heard someone screaming, "Stop, Stop. Please don't. I will give you whatever you want. Don't do it. Stop. I will give you the ring. Whatever you want. Just leave me alone." She snuck outside so as not to be seen, and she saw a car that she had also previously seen from her window. She went back upstairs and got into bed. She and her husband debated calling 9-1-1 because the screaming was so severe. About that time, the screaming resumed, and she went outside. She found Westling's porch light on, so she went over and asked if he needed help. He responded he did.

Dr. Dingeldein stated that at first she did not recognize the person hunched over in the doorway, because she was covered in blood, her neck was swollen, and she had leaves all over her. She determined that Cook could be going into hypovolemic shock, which happens when someone loses a large amount of blood. Cook had multiple stab wounds, was bleeding profusely, and had a severe hematoma on the side of her head. She began to ask Cook questions because she expected Cook to die, and she wanted to be able to catch the responsible party.

Cook described the couple as a black woman and a white man. Cook kept saying the man was vicious, and the woman kept hitting her with a gun. Cook described the situation to Dr. Dingeldein explaining that she had been to the store to get cigarettes, and, when she got home, she went to get the mail and was assaulted by the black female, who kept hitting her in the head with the gun. Cook told Dr. Dingeldein that she had been stabbed with kitchen scissors, but she was able to get free after she was placed in her Jeep, which the female was driving. Dr. Dingeldein simply could not believe that, considering all the injuries, Cook was not already dead. At that point, she prayed for Cook, and the sheriff's deputy arrived. In her opinion, the Defendant did not die because no artery or large blood vessel was hit with the scissors.

On cross-examination, Dr. Dingeldein stated that, when testifying that "they stabbed her," she used "they" because that is what Cook told her. She could not recall, however, whether Cook told her specifically that the female stabbed her. Additionally, Dr. Dingeldein never saw the gun that was allegedly used, but Cook stated repeatedly that she had been hit by a gun. Dr. Dingeldein testified that she was not worried about whether Cook's teeth were broken or whether Westling's dog was barking. Upon questioning about when she met Cook, Dr. Dingeldein was confident that she had met the victim on the previous Halloween.

On re-direct examination, Dr. Dingeldein testified that her testimony was based upon her own recollections of what happened the morning of October 29, 1999. In order to remember everything that happened that night, she typed up all of her recollections a few days after the incident. She did not read the newspaper articles about the incident. On re-cross examination, Dr. Dingeldein stated that she did not have personal knowledge about anything that the Defendant did, and any testimony

about that came from her questioning of Cook as she was lying in Westling's foyer.

Cook testified that in 1999 she lived in Cordova at 1353 Hardwood Trail and owned and operated the Wild Birdhouse. She talked to her then fiancé, Alan Gray, on the telephone on the evening of October 28, 1999, until about midnight. She hung up with him in order to go get cigarettes from the gas station located three to four blocks from her home. She stayed at the gas station a couple of minutes and left to go back home. Upon arriving at home, she parked her Jeep in the garage and put on the parking brake. She went from the garage to get the mail, and, as she turned back towards the house, she saw a girl running towards her with a gun. She described it as a black gun, which turned out to be a revolver. She knew it was a revolver because later, when the Defendant was repeatedly hitting her with the gun, the cylinder fell open.

Cook then identified the Defendant as the person who attacked her on October 29, 1999. She stated that she had never met either the Defendant or Jeremy White. In describing the attack, Cook stated she yelled for help, but the Defendant told her to shut up and repeatedly called her a "mother f***ing white b***h 'ho." Cook and the Defendant fought over the gun, and the Defendant repeatedly tried to put the gun to Cook's temple. A car then drove up and stopped at her driveway. A man got out of the car and tackled Cook in the yard. Next, Cook was shown a photograph of Jeremy White, and she identified him as the person who ran up, tackled her, and stabbed her seventeen times.

At that point, Cook told the Defendant and White they could have whatever they wanted; she expected them to merely want her purse. The Defendant gave the gun to White, who placed Cook in some sort of choke-hold, walking her into the garage. White gave the gun back to the Defendant, who used the gun to break a window. Then, the garage door was lowered. The Defendant warned that Cook better not have an alarm, but Cook was only concerned about her twelve year old german shepard, Chelsea. The Defendant and White then allowed Cook to put Chelsea into a closet. After Chelsea was safely inside the closet, the Defendant began to beat Cook repeatedly with the gun, all the while, continuing to call her "mother f***ing white b***h 'ho." White restrained Cook during the repeated beatings. The Defendant asked Cook for money, and Cook responded that there was change in a glass bowl on the table. This simply made the Defendant more angry. She took the gun by the barrel and hit Cook on the left, then right, then left, then right. Cook estimated that she was hit at least six times in this manner. Cook described the look on the Defendant's face as "pure hate." Cook stated, "she had her face right up in my face and the gun barrel between my face and her face, the gun barrel in my mouth rubbing my tooth and up to my eye."

Cook testified that she somehow managed to get over to the dresser, where she found jewelry to give to the Defendant. Although she could not specifically recall, she believed she gave the Defendant a couple of rings and necklaces. At that point, the Defendant said, "Are you tricking on us?" Cook had never heard that phrase, so, she stopped, looked up, and saw herself in the mirror. She said she could not recognize herself with all the blood streaming down her face from the blows inflicted by the Defendant.

Next, the Defendant left the bedroom and began searching the house while White maintained the choke-hold on Cook. The Defendant went through drawers, looked under mattresses, and through the refrigerator and pantry. She broke many things including things of sentimental value to Cook, including a ceramic Christmas tree Cook's grandmother had made. Once White and Cook got into the den, White lifted Cook up by her neck from behind, strangling her. Then, he set Cook back on the floor and attempted to break her neck. Up to this point, White had not said a word; the Defendant made all the threats. Next, White drug Cook back into the kitchen and got a pair of scissors out of a drawer. He stabbed Cook, then waited a second — stabbed her again, then waited a second. White did this repeatedly, and Cook described him as "getting off on it." The worst wounds came from him stabbing her at the base of her neck, which caused blood to "spew" out. White additionally stabbed Cook's right hand, where the scissors went all the way through her hand. At that point, Cook thought she was going to die. During the stabbing, the Defendant looked through the refrigerator in the kitchen.

White then dragged Cook into the bedroom where he inflicted the last of seventeen stab wounds by stabbing Cook in the abdomen. The Defendant was present in the bedroom also. During the incident, the Defendant never had any mask on, or anything else that would conceal her face. After the last stabbing, Cook was thrown over a table, and White said, "Is she out?" This was the first time Cook heard White speak. The Defendant said, "no, that b***h ain't out," and pushed Cook off the table onto the floor. At that point, Cook was able to stand up, and she saw White's face for the first time. He said to put Cook in the car, which they did. The Defendant got into the car and yelled at Cook to be still, repeatedly calling her a "mother f***ing white b***h 'ho."

Cook attempted to play dead so as not to appear to be a threat. When she saw the Defendant was having trouble operating the car because the parking brake was on, Cook saw her chance to escape. She was able to get the rear driver's side door open. Unfortunately, her hand was tangled in her bloody, matted hair, so she had to rip her hair out to use her hand. She went head first out the door and "scraped both of [her] knees really bad[ly]." She was able to crawl to her neighbor's house. The Defendant did not assist Cook in any way in getting out of the car and said nothing similar to, "ma'am, this man is trying to kill you, you really need to leave right now."

Cook testified that she was able to get to her neighbor's house, and she described her condition, "I was completely beaten up. Covered with blood. My head pummeled with a gun. Stabbed in the abdomen. I mean I was in bad shape. I was surprised I made it to my neighbor's, but I did." She arrived at Westling's house and fell on the floor. Dr. Dingeldein came over and gave aid. Dr. Dingeldein asked if she had been raped or if it was Cook's boyfriend who hurt her. She said no and told them there was a gun involved, but she had been stabbed with scissors. Cook did not feel much pain while she was being hit, but, once she got to Westling's house she was in agony.

At some point, the ambulance arrived, and Cook was placed on a gurney. Her boyfriend arrived shortly thereafter. She was concerned about her dog, Chelsea, but Cook had no personal knowledge of what happened to the dog. Once she was in the helicopter, the nurse told her it would only take six minutes to get to the hospital. She kept repeating: four minutes — three minutes —

two minutes.  Cook was taken to the Med, where she received treatment for severe head trauma and the stab wounds.  She was in the hospital for six days, and she had medical bills of thirty-five thousand dollars.

After Cook was released from the hospital, she was in a neck brace for two weeks, and she had plastic surgery for the facial stab wound.  She also went to a chiropractor extensively for neck problems caused by White attempting to break her neck.  She could not raise her arm above her shoulder level for more than a month after the incident.

Cook testified that the Defendant and White stole two rings, one with diamonds in it, two or three gold necklaces, and a gold bracelet.  The Defendant also took Cook's binoculars and her purse.  All of these items were eventually returned to her.  After identifying numerous pictures of the crime scene, Cook testified that the Defendant never attempted to help Cook, or intervene on her behalf when she was being stabbed by White.  White never hit Cook with the gun: the Defendant was entirely responsible for that portion of the assault.

On cross-examination, Cook testified that she lives on a street that could be described as a "cut-through."  She did not recall whether she had her purse with her when she went to the gas station.  She had been in the habit of putting her parking brake on since she was sixteen years old.  Cook got out of her car, walked around the corner, because her driveway was on one street while her front door was on another, and got her mail.  There was virtually no lighting because there were no streetlights, but Cook's porch light was on.  Cook had a door from the garage into the kitchen, which was partly made of glass.  That door was locked because Cook had not gone inside before she went to go get her mail.  She did not use the front door, so she planned on going back through the garage door entrance to her house.  At that point, she saw someone with a gun.  Reading from a statement she gave to a police officer, she saw a "figure," and "knew real quick it was a black girl with a gun."

Cook stated that her glasses were lost during the attack in the yard.  Cook admitted she had impaired vision without her glasses, but she stated that she had no trouble seeing the Defendant, White, the gun, or the scissors.  In discussing her own purses, she testified she did not know which purse the Defendant took.  When the attack happened, she dropped her keys in the yard.  After the stabbing, the Defendant went back into the yard to find the keys.

Defense counsel then attempted to discredit Cook's testimony by pointing out a potential discrepancy between what she testified to at trial and a statement she had given to a prosecutor one month after the attack.  In her statement to the prosecutor, Cook said "she unlocked the door and went in . . . and hit the garage door."  In her testimony, she maintained the garage door was lowered before the door window was broken.  Additionally, Cook told the prosecutor that she bit the Defendant during the struggle, but apparently she only thought she had bitten the Defendant.  Cook also testified that, at least once, the Defendant touched her after she was bloody.  Cook and the defense counsel discussed whose hair Cook had in her hands once she got to Westling's, and Cook maintained it was her own.  Cook also denied telling the Defendant's mother that the Defendant

saved her life. Cook admitted that the Defendant did not attempt to run over the victim after she exited the vehicle.

On re-direct examination, Cook stated the Defendant was not invited into her house, and she took Cook's Jeep without her consent. Cook never saw the Defendant with a rock. She possibly could have had trouble seeing at times because of the blood in her eyes, but, on the whole, she could see people and a gun. Cook stated she was not confused about anything and was not lying.

Alan Gray testified that he and Cook had been dating seriously for about two years at the time of the attack. He and Cook talked on the phone the night of October 28, 1999, until a little after midnight. At 1 a.m., he received a call from Westling that Cook had been beat up, and he rushed over. When he arrived, he announced himself as her fiancé. He was not able to talk to Cook, and they just exchanged looks. He was concerned that she might die, and this concern lasted at least two days. Cook's parents traveled with Cook to the Med in the helicopter.

In describing Cook's house, Gray testified that there were five rooms with blood and damage. The master bedroom, the kitchen, and the den all had large amounts of blood in them. Gray testified that Cook had months of pain and physical therapy after the attack.

On cross-examination, Gray testified that he understood that he was the original suspect because of his relationship with Cook, but that suspicion quickly passed. It only took him about ten minutes to get from midtown to Cook's house because of the speed at which he was driving. After he got to Cook's house, one of the Sheriff's deputies took a statement from him. He walked through the house with one of the police officers after he made the statement but that was not until around 4 a.m. He went briefly into the house to get Cook's dog, but he did not specifically recall whether the dog was in the house or in the yard. Gray also did not recall which door he went through to get into the house. Gray seemed to recall that there were people taking pictures and looking for evidence when he first went into the house. He recalled seeing a purse on the kitchen floor with its contents spilled out.

Gray testified that he told a police officer that he might have expected Cook's german shepard, Chelsea, to attempt to defend Cook. There was blood in many locations throughout the house, sometimes splattered, sometimes pooled. In 1998, Cook and her father decided to jointly purchase the house. Gray and Cook were dating seriously then, but Gray had no input on the purchase. Gray was acquainted with Westling, but he had not met Dr. Dingeldein. Gray never discussed the incident with any other witnesses, however, he discussed it with Cook and with the prosecutor from the District Attorney's Office. Gray stated that his testimony was primarily what he saw and observed personally, except for much of the medical information, which was passed from Cook's parents to Gray.

Detective David Boddie, currently a narcotics detective with the Shelby County Sheriff's Department, testified that he was a patrolman in 1999, when the attack took place. On the night of October 28, 1999, Detective Boddie received a call about an incident, and he arrived on location at

about 12:40 a.m. When he got to the scene, he observed a white female with multiple injuries to her face, neck, and abdomen. Her shirt had to be ripped off to determine the extent of the injuries, and she was bleeding profusely. Neighbors were present, but Detective Boddie did not specifically recall whether he arrived before or after the paramedics. Cook was in no condition to talk, so he got information from the neighbors.

Upon receiving information, Detective Boddie immediately radioed that Cook's Jeep was possibly taken in the attack, and officers in the area were to be on the lookout for it. Shortly thereafter, about 1 a.m., the detective received information that Cook's Jeep had been stopped. Ten to fifteen minutes after Detective Boddie arrived on the scene, Cook was airlifted to the hospital with critical injuries. After Cook was taken from the scene, Detective Boddie prepared an offense report. He was not involved in the arrest of the Defendant, but he did see the Jeep, which had crashed into a fence off of Appling Road. Detective Boddie testified he had never met the Defendant before that night.

On cross-examination, Detective Boddie testified he was on the eleven to seven shift, and he was permitted to patrol anywhere in Shelby County. The detective got a call from the dispatcher, and he believed he was the first car on the scene but was not absolutely sure. Detective Boddie got information from the two neighbors, Westling and Dr. Dingeldein. The scene was very hectic, and he thought he probably got statements from the two neighbors individually, but he did not recall specifically. He made his report after the incident. Detective Boddie never found a gun, and to his knowledge, no one else did either. The detective saw the Defendant at the scene of the crash, but he did not recall what she was wearing.

Deputy Jeremy Finch, of the Shelby County Sheriff's Department, testified that he was working on a ten to six shift the night of the accident. He responded to a call about a white Jeep Cherokee at about 1 a.m. Over the radio, Deputy Finch was advised that another officer was behind the suspect Jeep and intended to pull it over, and Deputy Finch pulled in behind this officer's car. Just as the Jeep was getting on the ramp from Germantown Parkway to Interstate 40, Officer Clark and Deputy Finch turned on their emergency lights and sirens and attempted to stop the vehicle. Initially, the Jeep looked as though it was going to pull over, but then it accelerated going westbound on the interstate. At that point, a small Mitsubishi pulled up next to the Jeep, which Finch later learned was an acquaintance of the Defendant. The Jeep slowed down and sped up a few times, traveling at a maximum speed of seventy miles per hour.

After about a mile of chasing the Jeep, the driver attempted to exit the interstate on Appling Road. It "overshot" the exit ramp and went down a hill, across a dead end street, and through a fence. The Jeep came to rest on a second fence. The officers exited their vehicles because of the terrain and saw the Defendant exit the Jeep and proceed to a small wooded area. The officers chased down and subdued the Defendant. According to the arrest ticket, all this happened at 12:56 a.m., October 29, 1999.

Deputy Finch remained on the scene, did not search the Defendant, but prepared an accident

report because the Jeep was damaged. Photographs of the damaged Jeep were admitted into evidence, as well as a picture of the Defendant. Deputy Finch identified the picture of the Defendant as the person who was arrested that morning.

Sergeant Scott Wright, of the Shelby County Sheriff's Department, testified that he was called to the scene of a robbery and stabbing on the night of October 28, 1999. His job was to process the scene for evidence, so he looked for anything that may have been involved in the crime. Part of his duties were to take pictures of the scene. The trial court then admitted into evidence a number of photographs taken by Sergeant Wright and a diagram drawn by Sergeant Wright. The sergeant described a shoe that was found in the yard, and one that was found in the street. The jury was shown pictures of a wallet on the floor of the garage and credit cards that were also on the floor of the garage. The jury was then shown a picture of the door that led from the garage into the kitchen, which had a broken window pane. The jury was then shown pictures of the inside of Cook's house, and a picture of the rug that was in Westling's foyer.

On cross-examination, Sergeant Wright stated that he could not recall specifically whether a perimeter was set up, but the house was secured. There was a statement in the report that mail had been strewn about on the lawn, but it had been picked up by the time Sergeant Wright arrived. Sergeant Wright described finding the credit cards on the left side of the garage, which would be the driver's side of the car. In discussing the victim's shoes, Sergeant Wright stated that one shoe was found in the middle of Sand Creek Cove, and one shoe was found in the victim's yard.

Sergeant Raymond Sides of the Shelby County Sheriff's Department testified that he was part of the personal crimes division in October 1999. Sergeant Sides testified that he was present when the Defendant was arrested on the morning of October 29, 1999. He identified the Jeep from previously admitted photographs, and he stated that he searched the Defendant after other officers had detained her and found two gold rings, one with six clear stones in it, and two gold necklaces. He took these items and placed them in an evidence envelope, which was then placed in a property room. Sergeant Sides then identified the envelope that he used. Sergeant Sides also searched Cook's Jeep but was unable to locate a gun, scissors, or a rock.

On cross-examination, Sergeant Sides testified that when he arrived on the scene of the Jeep accident, he found the Defendant in the custody of Officer Clark. Sergeant Sides did not find a purse when he searched the Jeep. After the search, a wrecker was called, and the vehicle was taken to Arlington. All four doors on the Jeep were shut.

Sergeant James Mayes, who currently works for the Interstate Interdiction Division, stated that he worked with the homicide unit of the Shelby County Sheriff's Department in 1999. The morning of October 29, he was called to Cook's home, and he later visited the scene of the Jeep accident in order to look for a weapon that was possibly used in the attack. The only thing found was a receipt from the gas station on Germantown Parkway, which Cook had just returned from prior to being attacked.

The trial court admitted photographs of the receipt, the outside of Cook's Jeep, and the inside of Cook's Jeep, which showed blood stains. The receipt showed that Cook purchased the items from the gas station at 12:20 a.m. on October 29, 1999.

On cross-examination, Mayes stated that he first met the Defendant on October 29, 1999, in his office, located at 201 Poplar Avenue, Memphis. When he saw her, she was wearing an orange jailhouse shirt as she had already changed out of the clothes she was wearing the previous night. Mayes took a statement from Cook on November 1, 1999, but he also thought he spoke with her the night of the attack. Mayes explained that Cook stated she was attacked with a gun, which is why the officers were searching for a gun.

The Defense called Norma Cartwright, the Defendant's mother. Cartwright testified that she met the victim, and the victim told her that she had forgiven the Defendant, and the Defendant saved her life. She had also met Jeremy White, and she described him as her "worst nightmare."

On cross-examination, Cartwright stated that the Defendant met White while at Woodale school, when she was seventeen. She admitted that the Defendant had problems before the age of seventeen, including being raped at sixteen, and juvenile problems at thirteen, fifteen, and sixteen. At thirteen, she was arrested for theft of property; at fifteen, she was arrested for assault; and at sixteen, she was arrested for aggravated assault. Cartwright stated that she did know about the Defendant's arrest for pointing a gun at two people and threatening to kill them, but she said that this behavior was a result of the rape.

After considering this evidence, the jury found the Defendant guilty of evading arrest in a motor vehicle with risk of death, attempted murder in the first degree, especially aggravated robbery, two counts of especially aggravated burglary, and four counts of especially aggravated kidnapping.

## C. Sentencing Hearing

A presentence report was admitted into evidence by the trial court, which included a statement by the victim, who indicated that she would rather not testify at the sentencing hearing. The State called Westling, who testified about the emotional impact that the attack had on him and his family. Dr. Dingeldein also testified about the numerous victims left in the wake of the attack by the Defendant. She stated that for months she smelled blood and saw the holes in Cook's face.

The Defendant testified that she was sorry, and if she had the power to change anything, she would. She further read from a prepared statement, including "the temptation is there, even the will is there, but there is no desire for me to further commit any of the charges if I wanted to. If I wanted to, it's right there, but I don't want to." The Defendant's written statement was entered into evidence and consisted of fifteen handwritten pages. Defense Counsel questioned the Defendant, who stated that she knew that she was bipolar. Additionally, she stated that she was raped at sixteen by her sister's boyfriend. She was in therapy, and at one time doctors told the Defendant's mother that she was mildly retarded. The Defendant got her diploma and joined the Navy, which promptly sent her

back home after a failed drug test.

The Defendant stated that on the night of October 28, 1999, she was on heroin, cocaine, marijuana, and alcohol. She and White were able to pay for these things from money obtained out of White's parents' bank account. The Defendant stated she had completed alcohol, drug, parenting, and job readiness classes during the six years that she had already spent in jail.

On cross-examination, the Defendant stated that her prepared statement took her from March to June to write. To her, it meant that she had focused on the errors of her life, and it showed soul searching. She stated that she took stuff from Cook, hit her a few times with a "pocket sized" rock, and took her car. She also said she blacked out for portions of the evening, but she remembered seeing Cook at a gas station and following her home. She stated that she did not know White was stabbing Cook, and, when she found out, she shook her head no. While White was stabbing Cook, she was looking through the house for money. She did not threaten to kill Cook, she merely told her to shut up and cursed at her. She repeatedly stated she did not beat the victim with a gun.

The State asked for enhanced sentencing based on the following: (1) the Defendant had a prior criminal history; (2) the victim was treated with exceptional cruelty; (3) the Defendant used a gun in the commission of the crime; (4) the Defendant was convicted as a juvenile of crimes that would be felonies had she been an adult; and (5) because she was the leader of the two assailants. As to the specific crimes, the State asked for four years for intentionally evading an arrest, twenty-five years for attempted first degree murder, twenty-five years for the two merged counts of especially aggravated robbery, twelve years for especially aggravated burglary, and twenty-five years for the four merged counts of especially aggravated kidnapping. The State argued that there were no mitigating factors and numerous enhancement factors. The State also asked for consecutive sentencing in light of the severity of the offenses and because the public should be protected from further serious criminal conduct by the Defendant.

The defense responded that many of the Defendant's problems stem from her history of drug abuse and her being raped. The defense also suggested that the Defendant's low IQ should be considered in mitigation.

The trial court heard the arguments, and stated that this was the worst set of facts he had ever heard in his forty years dealing with criminal cases. When the victim did not have the money that the Defendant wanted, she beat the victim "unmercifully." The court found the jury's determination of guilt on all the charges was proper and that the Defendant was a Standard Range I Offender. Additionally, the court found the Defendant had a history of criminal behavior, the Defendant was the leader in the crimes, the victim was treated with exceptional cruelty, the victim used a deadly weapon, and the Defendant was convicted of crimes as a juvenile which would be felonies as an adult. The court also noted that the Defendant had eight disciplinary write-ups while incarcerated before trial according to the presentence report. The trial court found that the Defendant tried to manipulate the competency examination by the doctors before trial. The court considered the problems the Defendant had growing up, assuming she was raped, but noted that these problems

were not an excuse for what she did.

The trial court sentenced the Defendant to four years for evading arrest, twenty-five years for attempted murder, twenty-five years for especially aggravated robbery, twelve years for especially aggravated burglary, and twenty five years for especially aggravated kidnapping.[2]  The court also determined that, because of the severity of the offenses and the dangerousness of the Defendant, the sentences should run consecutively, for an effective sentence of ninety-one years.

### D. Motion for a New Trial

The Defendant made a motion for a new trial arguing the Defendant was incompetent to stand trial due to her low IQ.  Additionally, the Defendant raised the issue of the length of time it took for her case to come to trial — roughly six years.  The Defendant also claimed that there was insufficient evidence to support the attempted murder and especially aggravated kidnapping convictions.  Finally, the Defendant claimed that the trial court failed to mitigate the Defendant's sentence due to her low IQ and history of mental health problems.

The trial court determined that the Defendant was competent, as opined by Dr. Vinturella and reinforced by the Defendant's statement to the court at her sentencing, and that there were "overwhelming" facts to support the Defendant's convictions for both attempted murder and especially aggravated kidnapping.  The trial court found that the Defendant was malingering, and she showed little or no reason to mitigate her sentence.  Finally, the trial court found that the Defendant never asked for her trial, and any delays were caused either by the Defendant or by her co-defendant, and that the Defendant showed no prejudice because of the delay.

It is from the above mentioned judgments that the Defendant now appeals

### II. Analysis

On appeal, the Defendant contends that: (1) there was insufficient evidence to sustain her convictions for attempted murder and especially aggravated kidnapping; (2) the trial court erred when it sentenced the Defendant; (3) the trial court erred when it relied on certain testimony in determining whether the Defendant was competent; and (4) her Constitutional right to a speedy trial was violated.

### A. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence for her convictions of attempted murder and especially aggravated kidnapping.  When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most

---

[2]The two counts of especially aggravated burglary were merged, as were the four counts of especially aggravated kidnapping.

-13-

favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); Liakas, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### 1. Attempted Murder

One is guilty of criminal attempt when that person,

acting with the kind of culpability required for the offense:
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and

-14-

believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step towards the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3) (2003). First degree murder is the premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1) (2003). Tennessee Code Annotated section 39-13-202(d) defines premeditation as "an act done after the exercise of reflection and judgment." Premeditation is thinking about the killing before it happens. State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992). This is a question of fact for the jury to determine, and it can be inferred from a number of circumstances, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

The Defendant contends that, because the victim's testimony was "uncertain as to details," her testimony should not be believed. The Defendant claims that, because this was the only testimony in which someone personally witnessed the Defendant repeatedly beating the victim, if it was discounted, there would be insufficient evidence to convict the defendant. However, we note that it is well-established law in Tennessee that the testimony of a victim, standing alone, is sufficient to support a conviction. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993); State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). Additionally, this Court cannot re-weigh the evidence presented at trial. We must view the evidence in the light most favorable to the State, and that provides ample evidence upon which to convict the Defendant.

The Defendant has stated that she did not feel responsible for the stabbing because White was the one who actually stabbed the victim. However, "A person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . ." Tenn. Code Ann. § 39-11-402(2) (2003). "Each party to an offense may be charged with commission of the offense." Id. § 39-11-401(b) (2003). Because the Defendant and White were attempting to rob the victim, and both profit from the robbery, they are responsible for each other's actions.

The evidence at trial proved that the Defendant and White followed the victim home from a gas station and tackled her on her lawn, outside of her home. The victim was dragged inside her house where the Defendant beat her repeatedly with a gun, and White stabbed her seventeen times with a pair of scissors. These facts show the use of a deadly weapon on an unarmed victim, particular cruelty, and preparation. Thus, there was clear evidence upon which to find premeditation. Additionally, the beating and stabbing of the victim in this case were substantial steps towards her

being killed. The jury had ample evidence upon which to convict the Defendant of attempted first degree murder of Cook. The Defendant is not entitled to relief on this issue.

## 2. Especially Aggravated Kidnapping

One is guilty of especially aggravated kidnapping when that person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty" and the crime is "(1) accomplished with a deadly weapon . . . or where the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-302(a), -305 (2003). Serious bodily injury involves, among other things, "a substantial risk of death" or "extreme physical pain." Tenn. Code Ann. § 39-11-106(a)(34) (2003).

Again, we must view the evidence in the light most favorable to the State, as a conviction removes the presumption of innocence and imposes a presumption of guilt. Cook testified that she was taken against her will into her home. She was confined inside of her home while she was beaten with a gun and stabbed with a pair of scissors. She was then placed in the back of her car. The Defendant began to back out of the driveway, at which point Cook escaped from the car. There is ample evidence for a jury to determine she was confined or removed, and the confinement and removal substantially interfered with her liberty. The jury also heard evidence that a gun and scissors were used to hurt the victim, and that the victim suffered serious bodily injury. A reasonable jury could conclude, from the evidence presented, that the Defendant committed especially aggravated kidnapping. This issue is without merit.

## B. Sentencing

When a defendant challenges the length, range or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2003). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm's Cmts. This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, Tenn. Code Ann. § 40-35-103 (2003), we may not disturb the sentence even if a different result was preferred. State v. Ross, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Dean, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a de novo review of a sentence, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing, (4) the arguments of counsel relative to sentencing alternatives, (5) the nature and characteristics of the

offence, (6) any mitigating or enhancement factors, (7) any statements made by the defendant on his or her own behalf and (8) the defendant's potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. § 40-35-210 (2003); State v. Taylor, 63 S.W.2d 400, 411 (Tenn. Crim. App. 2001).

## 1. Consecutive Sentences

The trial court made the determination that the Defendant's five separate sentences should run consecutively. Tennessee Code Annotated section 40-35-115 (2003) requires that a trial court consider several factors when determining whether sentences should be run concurrently or consecutively. Among other things, if a trial court finds, by a preponderance of the evidence, that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high" it may order sentences to be run consecutively. Tenn. Code Ann. § 40-35-115(b)(4) (2003). The Tennessee Supreme Court has stated that, with regard to finding someone is a "dangerous offender," the trial court must find that "an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

At the sentencing hearing to consider whether the statutory and Wilkerson requirements were present, the trial judge stated that this was one of the worst cases he had heard in almost forty years in criminal law. The court stated it was hard to imagine how the victim lived through the attack after the Defendant "beat her unmercifully." The Defendant was there, watching, while White repeatedly stabbed the victim. The court found the Defendant was the "major actor" and treated the victim with exceptional cruelty. The Defendant planned for the victim not to live through the incident, as shown by her being put into her own car to be driven away. The victim was so badly beaten that her next-door neighbors of over a year did not recognize her. The Defendant showed little regard for human life and did not hesitate in committing a crime in which the risk to life was high.

Because the trial court made sufficient findings on the issue to support consecutive sentencing pursuant to Tennessee Code Annotated section 40-35-115 and Wilkerson, we may not disturb the sentence. The Defendant is not entitled to relief on this issue.

## 2. Mitigating and Enhancement Factors

The Defendant also challenges the imposition of the maximum sentence within each range, supported by the finding of four enhancement factors and no mitigating factors. Specifically, the Defendant argues that the trial court failed to give any weight to the Defendant's low IQ score and drug addiction. Additionally, she contends too much weight was given to the findings that: (1) the Defendant was the leader in the commission of the offenses; (2) the victim was treated with exceptional cruelty; (3) a firearm or other deadly weapon was used in the commission of the crime; and (4) the Defendant committed acts as a juvenile that would be felonies if committed as an adult.

The trial court stated at the sentencing hearing that it had considered all the arguments made by counsel, including arguments concerning the Defendant's IQ and drug use. The court specifically addressed the IQ issue and noted that the Defendant was determined to be a malingerer, or one who intentionally answers incorrectly in order to appear ignorant. The trial court was well within its discretion to discount argument by counsel that the Defendant was mildly retarded, when in fact the court's expert determined she was not. Additionally, the Defendant has pointed to no legal authority that would indicate that the trial court erred in not giving mitigating weight to the drug use on the day of the attack.

As to the four enhancement factors, the trial court made specific findings of fact as to each one. With regards to being the leader, the court determined the Defendant was the first person to attack Cook; she was the one who verbally assaulted Cook, asking for money and searching the house; she repeatedly beat Cook with the handle of a revolver; she drove the Jeep in which Cook was placed. On the issue of treatment with exceptional cruelty, the Defendant beat the victim repeatedly over the head and neck and stood by while White repeatedly stabbed the victim. In addressing the third enhancement factor, the court found that a gun was used to repeatedly beat the victim. The Defendant admitted she used a rock to beat Cook. Additionally, a pair of scissors were used to stab Cook. Finally, as a juvenile, the Defendant was found guilty of aggravated assault after she threatened to kill her sister with a gun. This would clearly be a felony had the Defendant been an adult.

If the findings of the trial court are supported by the record, the amount of weight to give each factor is left to the trial court. Ross, 49 S.W.3d at 847. There are more than adequate facts in the record to support the trial court's findings and decision. As such, we will not re-weigh the factors. The Defendant is not entitled to relief on this issue.

### C. Competency

The Defendant has asserted as error the trial court's reliance on the testimony of Dr. Vinturella as a basis for finding the Defendant competent to stand trial. Specifically, the Defendant claims that the trial court erred because Dr. Vinturella knew "that the [Defendant] had been tested as a juvenile and scored an I.Q. below 70."

In determining whether a defendant is competent to stand trial, the principle question is whether the defendant "has mind and discretion which would enable him to appreciate the charges against him, the proceedings thereon, and enable him to make a proper defense." State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991) (quoting State v. Stacy, 556 S.W.2d 552, 553 (Tenn. Crim. App. 1977)). Additionally, we ask "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960). The purpose of the competency hearing is not to determine whether the defendant was competent at the time of the crime, but whether the defendant is competent to stand trial. Black, 815 S.W.2d at 175. The defendant is required to show incompetence by a preponderance of the evidence,

-18-

and we will not disturb the trial court's decision unless the evidence preponderates otherwise. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

The facts in this case do not support the Defendant's contention. In her testimony, Dr. Vinturella did not state that the Defendant had been tested and was given a score of 69 on an IQ test. Instead, the doctor stated that a comparable test had been performed and the conclusion was reached that, because of the Defendant's refusal to answer truthfully on the tests, no IQ test would be given. The doctor was questioned about the effects that the use of drugs and a rape would have on a score such as this, and she responded that such incidents could have some effect.

Dr. Vinturella conducted no fewer than three tests to determine if the Defendant was a malingerer. The trial court accepted this testimony and the evidence does not preponderate against that finding. Additionally, even if Dr. Vinturella obtained records that indicated the Defendant's IQ was below 70, the Defendant has not presented any law to support the proposition that the doctor should be disqualified as a witness. The Defendant is not entitled to relief on this issue.

### D. Speedy Trial

The Defendant also contends that her Constitutional right to a speedy trial was violated. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9; Tenn. Code Ann. § 40-14-101 (2003). When determining whether a Defendant's right to a speedy trial has been violated, we look to the balancing test set forth in Barker v. Wingo, 407 U.S. 514 (1972). See State v. Wood, 924 S.W.2d 342, 346 (Tenn. 1996); State v. Baker, 614 S.W.2d 352, 353 (Tenn. 1981). We examine the length of the delay, the reasons for the delay, whether prejudice resulted from the delay, and whether the Defendant asserted her right to a speedy trial. See Barker, 407 U.S. at 530; Wood, 924 S.W.2d at 346; State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1973); State v. Jefferson, 938 S.W.2d 1, 12-13 (Tenn. Crim. App. 1996). This balancing test "necessarily compels courts to approach speedy trial cases on an ad hoc basis." Barker, 407 U.S. at 530. If a court determines after applying this balancing test that a defendant has been denied a speedy trial, the remedy is reversal of the conviction and dismissal of the criminal charges. Id. at 522; Bishop, 493 S.W.2d at 83-85.

In this case, the crime took place in 1999 while the trial did not begin until 2005. A span of six years is indeed substantial. However, the reasons for the delay occurred primarily because the Defendant's co-defendant, White, had issues with his counsel. The record shows that White's counsel was a prosecutor in Collierville, an adjoining town to the area where the attack occurred. The State raised the issue of whether there was a conflict of interest, and that case went to the Tennessee Supreme Court, causing a substantial delay. See State v. White, 114 S.W.3d 469 (Tenn. 2003); Advisory Ethics Opinion No.2001-A-742. After that issue was resolved, the Defendant entered into conversations with the State, attempting to determine if she wanted to plead guilty. Eventually, the trial was conducted after the Defendant determined she did not want to plead guilty to the charges. These two reasons for delay both weigh against finding the right to a speedy trial was violated. See State v. Simmons, 54 S.W.3d 755, 760 (Tenn. 2001) (possible reasons for delay being "[1] delay necessary to the fair and effective prosecution of the case, such as locating a missing

witness; and [2] delay caused, or acquiesced, in by the defense, including good faith attempts to plea-bargain or repeated defense requests for continuances").

The most important factor in this analysis is whether the Defendant was prejudiced by the delay, thereby impairing her defense. Id. at 760; see also Barker, 407 U.S. at 532. A delay in excess of one year is presumptively prejudicial. Doggett v. United States, 505 U.S. 647, 652 n.1 (1992). We conclude that the presumption is overcome in this case. After the issue of White's counsel was resolved, the trial court actually continued the trial on multiple occasions at the Defendant's request. Additionally, the Defendant never requested that she be given a trial. There was no claim that the Defendant could not present witnesses or evidence because of the delay. In light of the reasons for the delay, the lack of prejudice, and the lack of any demand for a trial, the Defendant's right to a speedy trial was not violated.

### III. Conclusion

Based upon the aforementioned reasoning and authorities, we affirm the Defendant's convictions and sentences.

_____
ROBERT W. WEDEMEYER, JUDGE